UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

Lona Grant,

        Plaintiff,

v.

Walgreen Company d/b/a Walgreens,

        Defendant.

_____/

Case No. 10-11392

Honorable Nancy G. Edmunds

**OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT [14]**

Before the Court is Defendant Walgreen Company d/b/a Walgreens's motion for

summary judgment. Defendant alleges that Plaintiff Lona Grant is not entitled to relief on

her Age Discrimination in Employment Act, Family and Medical Leave Act, Americans with

Disabilities Act, and Michigan Elliott-Larsen Civil Rights Act claims that Defendant

discriminated against her based upon her age, her rights to medical leave, and her

association with her sick husband. Because the Court finds that Plaintiff has not created

an issue of fact on her claims, the Court GRANTS Defendant's motion and DISMISSES this

case.[1]

**I.    Facts**

The Court presents the facts in two sections. The Court first focuses on those facts

that are relevant to Plaintiff's age discrimination claim–facts that tend to show direct or

---

[1]The parties have stipulated to dismiss with prejudice the ADEA and ELCRA retaliation
claims. (Dkt. 19.)

circumstantial evidence of age discrimination, a discriminatory animus in Plaintiff's direct supervisor's actions, and Defendant's alleged reason for terminating Plaintiff.  The Court then focuses on those facts that support Plaintiff's FMLA and associational Americans with Disabilities Act claims–facts that tend to show that Defendant interfered or retaliated against Plaintiff when she asked about the FMLA.

### A.  Background facts

In 2005, Plaintiff, then 52 years old, started working at Walgreens.[2]  Several years later, in 2007, Plaintiff transferred to the Commerce, Michigan store after her request to work closer to her sick husband.  (Def.'s Mot. for Summ. J., Ex. E, Pl.'s Dep. at 89.)  When Plaintiff started at Walgreens, her district manager was Paul Bernicchi.   In 2008, Chris Hansard became her district manager.  From January, 2008, until Plaintiff's discharge on April 23, 2009, Jennifer Monacelli, then 26 years old, was the manager at the Commerce, Michigan store and Plaintiff's direct supervisor.  (Def.'s Mot. for Summ. J., Ex. C, Monacelli Decl. ¶ 4.)  Melissa Stark was the EXA during the relevant time period.  Plaintiff was one of two assistant managers at the Commerce store.

### B.  Discrimination facts

#### 1.  Plaintiff's alleged transaction violations

There are four separate incidents spanning from May, 2008 until April, 2009, that Defendant relies on in support of its argument that it legitimately terminated Plaintiff.  Each

---

[2]Each Walgreens district has a district manager, who oversees the individual managers at each of the Walgreens stores in the district.  In each store there is a manager.  A manager supervisors all of the employees.  Right below the manager is an EXA, and right below that position is the assistant manager.  Below that position were the other store employees.

2:10-cv-11392-NGE-MAR   Doc # 20   Filed 05/25/11   Pg 3 of 32   Pg ID 364

of these incidents involves Plaintiff allegedly violating one of Defendant's store policies for refunds, exchanges, or coupons. After each incident, Monacelli reported Plaintiff's action to Walgreens's loss prevention department. That department then investigated the allegations and made a report to Plaintiff's district manager, who issued written warnings and finally, after the fourth incident, terminated Plaintiff.

### a. First incident.

The first incident occurred in May, 2008. Plaintiff was on work release from jail.[3] (Pl.'s Dep. at 208.) She states that she purchased some clothes from Walgreens to wear, since work release prevented her from returning home to get clothes. Several days after she purchased the clothes, Walgreens put the clothes on sale. So Plaintiff brought the clothes and receipt back in to get a price adjustment. (*Id.* at 208.) Because there was no manager in the store at the time, she performed the price adjustment herself and did it in front of two employees; she states that she was visible on the store camera. (*Id.* at 209.) Plaintiff received a written discipline for that adjustment. (*Id.*)

Defendant maintains that processing a refund for oneself is a violation of store policy. Plaintiff states that she had done this type of transaction before and that, since she was a manager, Defendant trusted her. (*Id.* at 312.)

_____

[3]Both parties discuss a prior incident during which Plaintiff received a DUI and later went to jail for 30 days for that DUI. Defendant and Monacelli specifically initially recorded Plaintiff's absence as a no call/no show and terminated her employment. But when Defendant and Monacelli learned that Plaintiff was eligible to participate in the work release program, Defendant immediately reinstated Plaintiff's employment. Neither the incident nor the facts preceding or following the arrest/reinstatement to work are relevant to this motion and the Court therefore will not discuss the incident any further. (See generally: Pl.'s Dep. at 57-59.)

3

Plaintiff states that the actions she took fell within a "gray area" of store policy: "These are different gray areas, what management does. It depends who you are, where you work, and who you work with." (*Id.* at 312-13.)

On May 16, 2008, Monacelli contacted loss prevention because she learned that Plaintiff had made an exchange by herself, for herself, in violation of store policy. (Def.'s Mot. for Summ. J., Ex. F, Monacelli Dep. at 19-20.)

### i.   Walgreens' refund policy.

Walgreens has submitted its refund policy. That policy states that "[i]f [a manager] return[s] an item . . . [a]nother member of management must process and sign the refund for [the manager.] (Def.'s Mot. for Summ. J., Ex. G.)

### ii.   Interpretations of the refund policy.

The parties dispute what the refund policy actual covers. Plaintiff asserts that the policy covers only "refunds" and not exchanges such as the one that occurred in the first incident. Plaintiff also argues that there are a lot of "gray areas" in the policy. Monacelli maintains that Plaintiff's assertion is a "technicality" and that the policy covers both exchanges and refunds.

### b.  Second incident.

The second incident occurred in November, 2008, right before Defendant's Black Friday sale. Defendant created a report that chronicled the November, 2008 incident. Monacelli told loss prevention that Plaintiff had misused coupons, substituted items without Monacelli's permission, and reserved sale merchandise for her own benefit. (Def.'s Mot. for Summ. J., Ex. J, November, 2008 incident report.) The incident involved Plaintiff using two buy-one-get-one-free coupons when she was not supposed to use the coupon on a

4

free item.  (*Id.*)  The incident also involved Plaintiff reserving sale merchandise in the store's stockroom and then purchasing the items the following day.  (*Id.*)  Plaintiff paid back $5.36, the amount she received from the improper coupon usage.  (*Id.*)  For the second time, Bernicchi advised Monacelli to issue a final written warning for coupon misusage, substituting items without store manager's approval, and hiding sale merchandise.  (*Id.*)  On December 8, 2008, Monacelli issued that warning.  (*Id.*)  Plaintiff reviewed the report and signed it.  (*Id.*)  Plaintiff admits to substituting the razors, but she states that she acted appropriately because she had substituted items when working at her previous Walgreens store.[4]  (Pl.'s Dep. at 353.)

### c.  Third incident.

The third incident occurred in March, 2009 and involved Plaintiff's alleged misuse of expired "Register Reward" coupons.  (Pl.'s Dep. at 365.)  Plaintiff states that she became aware that the coupons had expired only after someone pointed it out to her.  (*Id.*)

### i.   Plaintiff contacts human resources.

---

[4]Two different loss prevention employees investigated the incidents involving Plaintiff. Michelle Livous was a Loss Prevention Supervisor with Defendant and she conducted investigations into the May and November, 2008 incidents.  (Def.'s Mot. for Summ. J., Ex. H, Livous Decl. ¶ 4.)  The first, in May, 2008, involved exchanging items without a separate manager's approval.  (*Id.* ¶ 6.)  The second incident, in November, 2008, involved the alleged misuse of a buy-one-get-one-free coupon, improper substituting of out-of-stock items, and placing items in the back room to purchase for herself at a later time.  (*Id.* ¶ 7.) Livous states that she spoke with Plaintiff about "proper coupon policies, the requirement that [Plaintiff] gain manager approval before substituting items, and the fact that [Plaintiff] should not be hiding items for her own benefit."  (*Id.*)  Livous further states that District Manager Paul Bernicchi decided to issue Plaintiff a final written warning in connection with the November, 2008 incident.  (*Id.*)  Livous states that age played no role in her investigation of Plaintiff and that she only had "general knowledge" that Plaintiff's husband had health issues.  (*Id.* ¶ 8.)

5

Danielle Geracaris, from the human resources department, states that Plaintiff contacted her in early April, 2009.  (Def.'s Mot. for Summ. J., Ex. R, Geracaris Decl. ¶ 3.) Geracaris alleges that Plaintiff reported that Monacelli was selectively enforcing dress code and loss prevention standards against her.  (*Id.*)

The call was the first contact Plaintiff had with Geracaris.  (Pl.'s Resp., Ex. A., Pl.'s Dep. at 125.)  In the conversation, Plaintiff states that she told Geracaris how Monacelli was 'nitpicking' at her about the schedule and "every little thing." (*Id.*)  Monacelli nitpicked, Plaintiff alleges, because Monacelli wanted Plaintiff to quit.  (*Id.*)  Plaintiff states that Geracaris did not respond in the way she wanted; Geracaris merely said that the issues were out of her hands.  (*Id.*)  Plaintiff states that she also told Geracaris that Monacelli was harassing her about "gray areas" in Defendant's policies.  (*Id.*)  By that, Plaintiff meant that there were a lot of areas in which managers would not write up another worker in management, because the other manager is "trustworthy."  (*Id.* at 126-27.)  Plaintiff also told Geracaris about an incident during which Monacelli "seemed to be bothered" by a large purchase that Plaintiff made; and when Plaintiff asked Monacelli about it, Monacelli said that Plaintiff was fine.  (*Id.* at 127.)  Plaintiff states that she does not remember if she told Geracaris that Monacelli was treating her poorly because Monacelli "didn't like older people."  (*Id.* at 130.)

### d.  Fourth incident.

The fourth incident occurred less than a month after the third, in April, 2009, and involved Plaintiff again allegedly using coupons in violation of Defendant's store policies. This time, though, the incident did not take place at Plaintiff's own store; the incident occurred at the White Lake, Michigan store.  There, she used two $30 Bayer glucose meter

6

coupons on five glucose meters, on sale for $12.74. (Pl.'s Dep. at 372-74.) She states that she contacted Bayer to find out whether this coupon use was reasonable. (*Id.* at 372.) And she states that she thought using the coupon on that number of glucose meters was "fine." (*Id.* at 373.) But during the transaction, Plaintiff was somehow credited for using three $30 coupons, rather than two. Plaintiff states that she called the White Lake store, asking the manager what to do, but that the manager never called her back. (*Id.* at 381.)

Monacelli states that Steve Summers, the White Lake store manager, contacted her in early April and told her that he had had an issue with Plaintiff using expired coupons. (Def.'s Mot. for Summ. J., Ex. F, at 66.) Monacelli maintains that she may have contacted loss prevention about the issues, but she did not personally investigate the incident or ask Plaintiff about the incident.[5] (*Id.*)

---

[5]Thomas Rebb, another loss prevention supervisor with Defendant, conducted the investigation into the March and April, 2009 incidents. (Def.'s Mot. for Summ. J., Ex. L, Rebb Decl. ¶ 5.) On March 24, 2009, Monacelli informed Rebb about the third incident–Plaintiff allegedly using a coupon that had expired several months prior and receiving coupon credit for more than the purchase price of certain items. (*Id.* ¶ 6.) Rebb states that he met with Plaintiff and reviewed Defendant's proper coupon and transaction policies. (*Id.* ¶ 7.) He states that she understood the policies and agreed to follow them. (*Id.*) Rebb then states that, a few days after his meeting with Plaintiff, he received information that Plaintiff had engaged in another personal purchase transaction in which she received improper coupon credits by presenting manufacture coupons in excess of item sale prices. (*Id.* ¶ 8.) Rebb filled out an incident report. (Def.'s Mot. for Summ. J., Ex. M, March 24, 2009 case inquiry report.) The report indicates that Plaintiff used an expired $10.00 "Register Reward" coupon, a Glade Air Freshener coupon for $7.99 that should have been modified to the $4.99 price of the item, and a $4.99 Glade Air Freshener coupon that should have been modified to the $4.00 price of the item. (*Id.*) The report shows that Plaintiff admitted that she presented the expired reward coupon but that she allegedly did not know that it had expired. (*Id.*) The report also shows that Plaintiff admitted that she presented the Glade coupons, but that she claimed that she did not understand the coupon policy that the coupons were supposed to be adjusted or modified not to exceed the price of the merchandise. (*Id.*) The report indicates that Loss Prevention would inform District Manager Greg Hansard of the warning. (*Id.*) The report notes that Plaintiff refused to sign the case inquiry and notes that she requested to speak with Defendant's employee

7

### 2.  Termination decision.

Hansard, Plaintiff's district manager in April, 2009, terminated Plaintiff.  (Def.'s Mot. for Summ. J., Ex. B., Hansard Dep. at 10.)  He reviewed her personnel file and the case files of the times that she allegedly misused the coupons and the incidents leading up to those times.  (*Id.* at 11.)  Hansard had no personal knowledge of any of the facts or circumstances that were discussed in the incident reports.  (*Id.* at 14.)  Hansard received all of his information from the loss prevention agent, Rebb.  (*Id.* at 23.)  Hansard ultimately told Monacelli to terminate Plaintiff.  (*Id.* at 20.)

Hansard reviewed the information he received about the alleged company policy violations.  He stated that "if there is a date on [a coupon] and it's expired and the cashier accepts an out-of-date or expired coupon, that would be . . . against policy."  (*Id.* at 23.)  He also addressed the glucose meter issue, stating that "the coupon redemption was $30 for one item. So the person would be profiting, which is  . . . against policy."  (*Id.* at 29.)  "You have to use one coupon per item, and the coupon can't exceed the value of the item."  (*Id.* at 30.)  Hansard stated that the policy against this practice was in the policy and procedures page on the Store Net.  (*Id.*)

Although he states that he recognizes that the cashier ringing up the coupon has a duty to check the coupons, he also states that a manager, such as Plaintiff, should uphold

---

relations department.  (*Id.*)
       The report also contains a summary of the incident that occurred a few days later, at the White Lake, Michigan store.  (*Id.*)  Rebb notes that the White Lake store manager, Steve Summers, contacted Loss Prevention because Plaintiff had purchased five Bayer Glucose Meters, valued at $12.74 and submitted three $30.00 coupons.  Upon further investigation, Rebb spoke with the employee who rang up Plaintiff's transactions and informed Rebb that Plaintiff told the employee to manually enter the coupons.  (*Id.*)

all the store's policies. (*Id.* at 32-33.) He states that if a manager makes a purchase in violation of the policy, they are knowingly doing so, even if they are acting solely as a customer. (*Id.*) He further states that Walgreens holds its managers "to a very high standard," and that its managers, whether on or off the clock, should uphold Walgreens' policies. (*Id.*)

Granted, Hansard has found that "[i]n some instances, the, the store manager may not let loss prevention know, if it's just a – something minor." (*Id.* at 39) But he acknowledges that "[he] can't speak firsthand what every manager would do in every single case." (*Id.*) Despite this discretion that store managers have in reporting certain policy violations, Hansard states that he had not become aware of any other employee engaging in similar transactions as Plaintiff. (*Id.* at 50.)

Hansard continues that he was particularly "troubled" by Plaintiff's transactions, since she, as an assistant manager, was supposed to follow merchandise transaction policies and procedures. (Def.'s Mot. for Summ. J., Ex. P, Hansard Decl. ¶ 4)

### 3. Monacelli's alleged discrimination.

Because Plaintiff has based her age discrimination claim on Monacelli's statements and actions alone, the Court discusses Plaintiff's allegations against Monacelli. (Pl.'s Dep. at 158.) These allegations do not fit squarely into any of the incidents discussed above. Rather, Plaintiff has alleged that Monacelli harbored a general discriminatory animus towards Plaintiff based upon her age. This animus, Plaintiff contends, is what led Monacelli to report each of Plaintiff's alleged policy violation incidents to loss prevention.

Plaintiff's first age discrimination allegations concern Monacelli's alleged favoritism towards the younger employees when creating the store work schedule. Plaintiff states

that "[Monacelli] was nicer to the younger ones . . . and . . . any time I needed a day off, it was so hard to get." (Pl.'s Resp., Ex. A., Pl.'s Dep. at 67.) Plaintiff states that Monacelli "favored younger employees over older employees," and gave her a hard time when she had to make doctor appointments for her husband, taking personal days for holidays and birthdays, and taking vacations. (*Id.* at 162.) Plaintiff states that when she requested vacation, Monacelli told her that she was only able to take seven days off in a row, whereas the other manager, Stark, was able to take off nine or ten days in a row. (*Id.*)

Plaintiff next suggests that several comments Monacelli made support her age discrimination claims. Plaintiff states that Monacelli made comments that several employees "really couldn't do their job because of the[ir] age" and that "[i]t would have been so much better if [the store] had younger people." (Pl.'s Dep. at 76.) Plaintiff states that Monacelli treated her differently than the younger employees, alleging that "[w]hen [she] got written up, [she] got fired, [but] [w]hen a younger person got written up, she got promoted." (*Id.*) Plaintiff also alleges that Monacelli made such comments relating to old people as "[t]hey weren't as smart because they were slower." (*Id.*)

Plaintiff offers one specific instance, during which Plaintiff alleges that Monacelli said something to the effect: "why don't you just quit and take care of your husband, you're old enough." (Pl.'s Dep. at 77.) But Plaintiff does not remember the date of the alleged comments, although she suggests that Stark might have been witness to the comment. (*Id.*)

Plaintiff states that Monacelli made age-related remarks on at least three occasions. (*Id.* at 77-78.) But Plaintiff does not recall whether there were any witnesses to the comments. (*Id.* at 78.) During one occasion, Plaintiff alleges that she responded to

10

Monacelli by saying "[w]ait until you get my age and see how well you are." (*Id*.) Monacelli allegedly responded: "I'm never going to get that old." (*Id*.)

Despite these alleged instances of discrimination, Plaintiff did not write anything down memorializing what she thought was discrimination in connection with her employment at Walgreens. She states that the discrimination was mainly verbal but that the scheduling evidenced discrimination, by the way Monacelli scheduled the older employees. (*Id*. at 74.)

Plaintiff also states that Monacelli discriminated against her because she made Plaintiff rearrange boxes, putting heavy boxes where it was more difficult for Plaintiff to reach. (*Id*. at 82.) Plaintiff states that this rearranging was discrimination toward her age because, Plaintiff states, if she were younger, she would have been able to do it." (*Id*. at 82-83.) But Plaintiff states that that was what she assumed Monacelli was thinking. (*Id*. at 83.)

Plaintiff alleges that Monacelli also discriminated against her because Monacelli did not give Plaintiff the scheduled time off that she wanted to see her children. (*Id*. at 84.) And on her birthday when she requested time off, Plaintiff claims that Monacelli said "[w]ell, you're old, you don't have to go out and celebrate." (*Id*.)

### C. FMLA and associational ADA facts

The next set of facts relates to Plaintiff's FMLA and associational ADA claims. These claims arise from Plaintiff's allegations that Defendant interfered with and/or retaliated against her for seeking FMLA leave and that Plaintiff's association with her husband, who was sick from Legionnaire's Disease and suffering from dementia, played an impermissible factor into her termination.

11

Plaintiff states that she asked about the FMLA at "different times" because she "knew [her] husband was just going to get worse." (Pl.'s Dep. at 90.)  She also states that she "wanted to find out what it was and look into it for up and coming, in case something happened." (*Id.* at 93.)  She states that Monacelli gave her some forms to look at. (*Id.* At 91.)  But when she did find out about FMLA leave, Plaintiff alleges  that Monacelli told her that she would have to give Defendant 30 days notice before she took her leave and that she would have to take all of her leave at once. (*Id.* at 94.)   Plaintiff asserts that because Monacelli was her manager, she believed what Monacelli told her about the FMLA. (*Id.* at 92.)

Notwithstanding her preliminary inquiries, Plaintiff never completed or submitted forms requesting FMLA leave. (*Id.* at 102.)  Nor did she contact anyone in the human resources department about taking an FMLA leave. (*Id.* at 103.)

She never asked about intermittent leave or part-time leave. (*Id.* at 115.)  The reason she did not, she states, was because Monacelli told her, that to take FMLA leave, Plaintiff had to give 30 days notice and then take the entire 12 weeks of leave. (*Id.*)

Plaintiff states that the reason for her inquiries into the FMLA was because she "wanted to find out what it was and look into it for up and coming, in case something happened [to her husband]." (*Id.* at 92, 93, 99.)

Plaintiff does add that she spoke with a former Walgreens manager when her husband first received his diagnosis in October, 2007. (*Id.* at 103.)  The other manager did not mention FMLA by name to Plaintiff, she merely comforted Plaintiff, telling her that taking leave was a possibility. (*Id.*)  Plaintiff also spoke with another Walgreens manager, at the

12

end of 2007 or beginning of 2008. (*Id.*) But she never pursued the matter any further until she asked Monacelli.

Monacelli states that she does not recall whether Plaintiff ever asked her about FMLA leave. (Monacelli Dep. at 70.) But she does state that she may have given Plaintiff a printed out policy about FMLA; stating that if an employee asks about FMLA, she prints out the appropriate paperwork that the employee may need and then she gives it to her. (*Id.* at 71.)

### 1. Defendant's FMLA documents.

Plaintiff has submitted several FMLA documents that she received from Defendant. The first of these, titled "Family Leave," states that "[t]he employee must give reasonable advance notice (at least 30 days whenever possible) of the intended Family Leave." (Pl.'s Mot. for Summ. J., Ex. J.) The document also states that "[a]ny time off taken for Family Leave purposes . . . will count towards the 12 weeks allowed annually under the [FMLA]." (*Id.*) The document also addresses intermittent or reduced-scheduled leave, stating that any questions relating to these types of leave "should be directed to the Danville Unpaid Leaves or Employee Relations Departments." (*Id.*) The second document that Plaintiff submitted is an overview of Walgreens's FMLA policy. Under "Leave Length," this document states "[w]hen medically necessary, FMLA-covered leave may be taken intermittently in periods of days or partial days. If you request intermittent or reduced schedule leave, you may be required to transfer temporarily to an available alternative position for which you are qualified that better accommodates recurring periods of leave." (*Id.*) This document also contains the process to apply for FMLA leave:

13

> There is no separate application or approval process specifically for FMLA leave.  All you need to do is apply for the type of leave of absence that you qualify for under Walgreens  policy.  Make sure you do so within the prescribed time frames, giving your manager adequate notice (at least 30 days) where your leave is foreseeable.

(*Ia.*)  The document also states that, should an employee have any questions, she should contact Walgreens's employee services department.

Plaintiff states that she received and read these forms.  (*Id.* at 94.)  But she also states that she went over the forms "real fast" and that she has "trouble comprehending when [she] read[s]." (*Id.*)  She states that Monacelli asked her what she thought the form meant, but then Monacelli told her that "you don't keep [FMLA leave] on hand." (*Id.* at 95.) So Plaintiff says she did not "question anymore because [she] didn't want to take [FMLA leave] yet because nothing happened [with her husband]. [She] was looking ahead." (*Id.*)

### D.  EEOC fillings

On June 22, 2009, Plaintiff, 56 years old at the time, filed a claim with the Michigan Department of Civil Rights, alleging that, when Defendant terminated her, it discriminated against her based upon her age.  (Def.'s Mot. for Summ. J., Ex. Q.)  On January 11, 2010, the Equal Employment Opportunity Commission mailed Plaintiff's right to sue letter to her. On April 7, 2010, she filed suit in this Court.

## II.   Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A moving party may meet that burden "by 'showing' – that is, pointing out to the district court -- that there is an absence of evidence to support the

nonmoving party's case."  *Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986).  Revised

Rule 56 expressly provides that:

> A party asserting that a fact cannot be or is genuinely disputed must support the
> assertion by:
>
> (A) citing to particular parts of materials in the record, including depositions,
> documents, electronically stored information, affidavits or declarations,
> stipulations (including those made for purposes of the motion only), admissions,
> interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence
> of a genuine dispute, or that an adverse party cannot produce admissible
> evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).  The revised Rule also provides the consequences of failing to

properly support or address a fact:

> If a party fails to properly support an assertion of fact or fails to properly address
> another party's assertion of fact as required by Rule 56(c), the court may:
>
> (1) give an opportunity to properly support or address the fact;
>
> (2) consider the fact undisputed for purposes of the motion;
>
> (3) grant summary judgment if the motion and supporting materials – including
> the facts considered undisputed – show that the movant is entitled to it; or
>
> (4) issue any other appropriate order.

Fed. R. Civ. P. 56(e).  "The court need consider only the cited materials, but it may

consider other materials in the record."  Fed. R. Civ. P. 56(c)(3).

When the moving party has met its burden under rule 56, "its opponent must do more

than simply show that there is some metaphysical doubt as to the material facts."

*Matsushita Electric Industries Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

Ultimately a district court must determine whether the record as a whole presents a

genuine issue of material fact, *id.* at 587, drawing "all justifiable inferences in the light most

15

favorable to the non-moving party," *Hager v. Pike County Bd. Of Education*, 286 F.3d 366, 370 (6th Cir. 2002).

## III.   Analysis

Plaintiff bases all of her claims on the theory that Monacelli's alleged discriminatory feelings, or animus, towards her age, her request for FMLA leave, and her association with her husband requires the Court to find that Defendant is liable. The Court must therefore review whether Plaintiff has shown the type of evidence needed to hold Defendant liable under this cat's paw theory. Because the Court ultimately finds that Plaintiff has not shown that Monacelli's actions were driven by her discriminatory animus based upon Plaintiff's age status, Plaintiff's discrimination claims fail. Plaintiff then attempts to hold Defendant liable for either interfering with or retaliating against her based on her FMLA rights. Plaintiff's claims again fail–she cannot show that Defendant interfered with her rights when she did not properly notify Defendant of her intent to take FMLA leave or seek further assistance with her questions and Plaintiff has not shown that Defendant's legitimate reason for terminating Plaintiff was pretext. And finally, with Plaintiff's associational ADA claim, she has not even alleged a causal connection between her termination and her husband's illness–thus causing this claim to fail as well.

### A. Plaintiff cannot use the cat's paw theory of liability

16

Plaintiff has alleged that Monacelli is the only person who had a discriminatory animus towards her. She therefore argues that this animus can be imputed to Defendant generally to hold Defendant liable for age discrimination in violation of the ADEA and ELCRA.[6]

Plaintiff relies on *Staub v. Proctor Hospital*, –U.S. –; 131 S.Ct. 1186 (2011) to support her theory that Monacelli's allegedly discriminatory animus in reporting Plaintiff's coupon/policy violations can be imputed to Defendant to hold it liable for discrimination. In *Staub*, the Court addressed whether Proctor Hospital had improperly terminated Staub's employment in violation of the Uniformed Services Employment and Reemployment Rights Act. 131 S.Ct. at 1190. That act makes it unlawful for an employer to terminate an employee based upon a discriminatory animus towards the employee's uniformed service status. *Id.* at 1190-91. The discriminatory animus towards the uniformed service status must be "a motivating factor in the employer's action." *Id.* (citing 38 U.S.C. § 4311(c)). The Court likened the USERRA "motivating factor" analysis to interpretations of Title VII's "motivating factor" requirement. *Id.* at 1191. The Court centered its analysis on what constituted a "motivating factor in the employer's action." *Id.* The Court quickly recognized that a motivating factor "obviously exists" when the company official who makes the decision to take an adverse employment action is personally acting out of hostility to the employee's [protected status.]" *Id.* But the Court found the precise issue–whether the "motivating factor" exists when the decision-making official has no discriminatory animus but was influenced by the previous company action that was the product of animus in

---

[6]The Supreme Court noted that the "cat's paw" theory was applied to employment law in 1990. *Staub v. Proctor Hospital*, –U.S. –; 131 S.Ct. 1190, n 1 (2011.) The theory merely is a way for a plaintiff-employee to hold an employer liable for a non-decisionmaking supervisor-employee's discriminatory animus.

someone else"–required a more complex framework. *Id*. The Court held that the motivating factor still existed, creating liability in the employer company. "Animus and responsibility for the adverse action can both be attributed to the earlier agent . . . if the adverse action is the intended consequence of that agent's discriminatory conduct. So long as the agent intends, for discriminatory reasons, that the adverse action occur, he has the scienter required to be liable under [the statute.]" *Id*. "The employer" therefore "is at fault because one of its agents committed an action based on discriminatory animus that was intended to cause, and did in fact cause, an adverse employment decision." *Id*.

Applying its analysis to the case, the Court found that Proctor Hospital's supervisors acted with a discriminatory animus towards Staub, and the Court thus held Proctor Hospital liable. *Id*. at 1194. There, the Court found that the supervisors had been motivated by hostility towards Staub's military obligations. *Id*. The Court stated that a reprimand by the supervisors constituted "conduct within the scope of an agent's employment." *Id*. (citation omitted). As to the discriminatory animus, there was evidence that one of the supervisors stated she was trying to "get rid of" Staub and there was evidence that the supervisor was "out to get" Staub. *Id*. The animus was directly related to Staub's status as a member of the Army Reserve. The Court found that Staub's supervisor would schedule Staub for "additional shifts without notice so that he would pay back the department for everyone else having to bend over backwards to cover his schedule for the Reserves." *Id*. at 1189. (citations and quotation marks and alterations omitted). The supervisor also informed one of Staub's coworkers that his "military duty had been a strain on the department" and asked that coworker to help her "get rid of him." *Id*. The supervisor's supervisor also held a

18

discriminatory animus towards Staub, stating that Staub's military obligations were a waste of taxpayers' money.  *Id.*  That supervisor was also aware that the other supervisor was "out to get" Staub.  *Id.*  The Court also found that the supervisors and  warnings issued to Staub that were wrongly issued and contested.  *Id.*  It was these wrongly issued warnings that the decisionmaker relied upon in terminating Staub.  *Id.*  The Court finally noted that the jury could have reasonably inferred from timing–as soon as the supervisor informed the decisionmaker, the decisionmaker terminated Staub–that the supervisor intended that Staub be terminated.  *Id.  See also Arendale v. City of Memphis*, 519 F.3d 587, 604, n 13 (6th Cir. 2008) (discussing that "[w]hen an adverse hiring decision is made by a supervisor who lacks impermissible bias, but that supervisor was influenced by another individual who was motivated by such bias, this [c]ourt has held that the employer may be held liable under a "rubber stamp" or 'cat's paw' theory of liability.").

Here, Plaintiff has not offered evidence of discriminatory animus in Monacelli's reporting of Plaintiff's policy violations.  In *Staub*, the discriminatory animus evidence related directly to the supervisor's reporting of Staub's alleged company violations.  There, the Court found that there was evidence that the actions that led to those violations were false and Staub's supervisor harbored ill-will towards his military status and that ill-will was the reason the supervisors issued him a corrective action and they had the intent to terminate him based upon that ill-will.  But here, Plaintiff has not shown the connection between Monacelli's alleged age discrimination and Monacelli reporting Plaintiff to loss prevention.  The majority of Plaintiff's evidence relates to Plaintiff's allegations that Monacelli favored the younger employees when creating the work schedule.  Plaintiff

19

alleges that Monacelli gave her a hard time when she requested time off for doctor appointments, personal days, or vacations.  (Pl.'s Dep. at 67, 162.)

Plaintiff also alleges that Monacelli made several discriminatory comments regarding age.  Plaintiff alleges that Monacelli said that several employees could not do their jobs because of their age and that the store would be better off if it had younger employees.  (*Id.* at 76.)  Plaintiff also alleges that Monacelli said that older employees were not as smart as the younger employees.  (*Id.*)   These remarks, in light of *Staub*, do not raise an issue of discriminatory animus.  These remarks do not indicate that Monacelli was "out to get" Plaintiff or that she made the remarks and reported Plaintiff to "get rid of her."

Plaintiff additionally argues that Monacelli's alleged statements of "why don't you just quit and take care of your husband, you're old enough" and  "I'm never going to get that old" reflect a discriminatory animus to get Plaintiff fired.  (Pl.'s Dep. at 77, 78.)  The Court does not agree.  These statements again do not raise an issue that Monacelli targeted Plaintiff and used Plaintiff's age as a reason to terminate her.  These statements do not show a connection between Monacelli's comments about age and her reporting of Plaintiff's alleged violations.

The Court therefore finds that the facts here are not analogous to *Staub*'s facts, and that there is no issue of fact that the evidence Plaintiff has presented fails to create a question that Monacelli's comments and scheduling were discrimination with the intent to get Plaintiff fired based upon Plaintiff's age.  Plaintiff consequently cannot rely on *Staub.*

### B. Age discrimination

20

Plaintiff first alleges that Defendant violated the Age Discrimination in Employment Act and Michigan's Elliott-Larsen Civil Rights Act because it fired her because of her age. Under the ADEA, it is unlawful for an employer

> (1) to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age; [or]
>
> (2) to limit, segregate, or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of an individual's age[.]

29 U.S.C. § 623(a). "The first clause [proscribes] intentional disparate treatment on the basis of age, while the second clause [proscribes] facially neutral employment practices with a disparate impact based on age." *Aldridge v. City of Memphis*, 404 F. App'x 29, 40 (6th Cir. 2010) (citations omitted).[7] Here, Plaintiff alleges a disparate treatment claim.

## 1. Disparate treatment

A plaintiff can prove an ADEA disparate treatment violation with direct or circumstantial evidence. *Aldridge*, 404 F. App'x at 40 (citation omitted). Direct evidence "is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Bhama v. Mercy Mem'l Hosp. Corp.*, No. 09-2193, 2011 WL 1086632, at *9 (6th Cir. Mar. 25, 2011) quoting *Amini v. Oberlin Coll.*, 440 F.3d 350, 359 (6th Cir. 2006). Direct evidence "does not require the fact finder

---

[7]The ELCRA prohibits "discriminat[ing' against an individual with respect to employment, compensation, or a term, condition, or privilege of employment, because of . . . age[.]" Mich. Comp. Laws § 37.2202(1)(a). The Sixth Circuit analyzes ELCRA claims under the same standards as federal ADEA claims. *Geiger*, 579 F.3d 614, at 626. Plaintiff's age discrimination ELCRA claim therefore rises and falls with her ADEA claim.

to draw any inferences to reach that conclusion." *Id.* *See also*, *Aldridge*, citing as examples of direct evidence, "a facially discriminatory employment policy or a corporate decision maker's express statement of a desire to remove employees in the protected group[.]" 404 F. App'x at 40 (citation omitted). But when the motivating factor behind an employee's termination is "some feature other than the employee's age," no disparate treatment claim under the ADEA exists. *Alrdridge*, 404 F. App'x at 40 (citation omitted).

Plaintiff alleges that Monacelli's statement are direct evidence of discrimination. The Court does not agree. Plaintiff has not presented any direct evidence connecting Monacelli's statements and her reporting Plaintiff to loss prevention.[8] The Court must therefore draw inferences to sustain Plaintiff's argument and Plaintiff cannot use a direct evidence path to her claim. She has not presented a facially discriminatory employment policy or a corporate decisionmaker's express statement of a desire to remove employees in the protected group. She can therefore only withstand a summary judgment motion if she creates a genuine issue of fact through circumstantial evidence and using the *McDonnell Douglas* burden shifting structure.[9] *Alrdridge*, 404 F. App'x at 40. A plaintiff must first "set forth a *prima facie* case of age discrimination." *Geiger v. Tower Auto.*, 579 F.3d 614, 622-23 (6th Cir. 2009). To do so, a plaintiff must show: "1) that she was at least 40 years old at the time of the alleged discrimination; 2) that she suffered an adverse

---

[8]Plaintiff only argues that Monacelli's statement are direct discrimination. (Pl.'s Resp. at 22.) The Court analyzes her claims as if she presented a circumstantial evidence claim as well because the pleadings are not entirely clear as to what type of claim Plaintiff is making and the circumstantial evidence test is relevant in the sections that follow.

[9]The Supreme Court set forth this test in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792 (1973).

employment action; 3) that she was qualified for the position held; and 4) that she was replaced by someone younger." *Tuttle v. Metro. Gov't of Nashville*, 474 F.3d 307, 317 (6th Cir. 2007). A plaintiff can satisfy the fourth element "by showing that similarly situated non-protected employees were treated more favorably." *Id.* (citation omitted). "To be deemed 'similarly situated' . . . 'the individuals with whom the plaintiff seeks to compare [her] treatment must have dealt with the same supervisor, have been subject to the same standards, and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Id.* (citation omitted). "If a plaintiff establishes a *prima facie* case, then the burden shifts to the defendant to articulate a non-discriminatory reason for its adverse employment action." *Id.* (citation omitted). If the defendant articulates a reason, then the plaintiff must demonstrate by a preponderance of the evidence that the defendant's proffered reason was a pretext for age discrimination. *Id.* In an age discrimination case, a plaintiff can establish pretext by showing "either (1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate [her] discharge, or (3) that they were insufficient to motivate her discharge." *Tuttle*, 474 F.3d at 319.

Plaintiff cannot establish a prima facie case of age discrimination. She has not established the fourth element of a prima facie case, that Defendant replaced Plaintiff with someone younger or that it treated someone "similarly situated" better than it treated Plaintiff. Plaintiff does not allege that she was replaced by someone younger. For the Court to consider that Defendant treated someone "similarly situated" better than Plaintiff, Plaintiff must show that "'the individual[] with whom [P]laintiff seeks to compare [her]

treatment must have dealt with the same supervisor, have been subject to the same standards, and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Tuttle*, 474 F.3d at 317 (citation omitted).

Although Plaintiff has alleged that Monacelli treated her differently than she treated the younger employees, she has not met her burden of proving that these younger employees were similarly situated.  (Pl.'s Dep. at 76.)  Plaintiff has not produced any evidence that another assistant manager used coupons in arguable violation of company policy as Plaintiff did, four times, and was not terminated.  The Court finds that Plaintiff has failed to establish a prima facie case and her age discrimination claims must fail.

But even if Plaintiff were able to establish a prima facie case of age discrimination, she still cannot show that Defendant's non-discriminatory reason for terminating her was pretext for discrimination.    Plaintiff does not show that the proffered reason for her termination–the violation/misuse of company policies–had no basis in fact.  Plaintiff solely argues that Monacelli's alleged discriminatory intent to terminate her should require the Court to find Defendant liable.  Since the Court has already discussed Plaintiff's cat's paw claim following from *Staub* and has found that Plaintiff has not presented a situation in which she can use the cat's paw theory, her pretext argument must fail.  Hansard made the ultimate decision to terminate Plaintiff.  (Hansard Decl. ¶ 4.)  He spoke with Rebb about Plaintiff's merchandise transactions that violated store policy.  (*Id.*)  Hansard states that Defendant relied upon Plaintiff, as an assistant manager, to "know and follow merchandise transaction policies and procedures."  (*Id.*)  From the transactions she made, Hansard

opined that Plaintiff had "an inability to understand and/or abide by important transaction and coupon rules." (*Id.*)  Her actions within the one year span, he states, "troubled" him, as did the fact "that she appeared not to be taking personal responsibility for her actions." (*Id.*)  Hansard further states that he did not know of any other management employee who engaged in conduct similar to Plaintiff's.  (*Id.*)  Plaintiff makes no argument that Hansard did not have enough information in front of him to terminate her.  What she appears to argue is that her actions did not give Defendant a legitimate reason to terminate her.  But the Court agrees with Defendant.   Plaintiff admits to making the transactions and there is no indication that Hansard harbored any discriminatory animus toward Plaintiff.  Here, the Court will not substitute its judgment for Defendant's when it comes to the reason it terminated Plaintiff.  Although the Sixth Circuit has stated "it is true that a factfinder should refrain from probing an employer's business judgment, a decision to terminate an employee based upon unlawful considerations does not become legitimate because it can be characterized as a business decision," Plaintiff has brought forth no evidence that Defendant, and specifically the loss prevention team and Hansard, terminated Plaintiff because of unlawful considerations. *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 576 (6th Cir. 2003) (quoting *E.E.O.C. v. Yenkin-Majestic Paint Corp.*, 112 F.3d 831, 835 (6th Cir. 1997)).  The Court therefore is supposed to consider the termination decision "to the extent that such an inquiry sheds light on whether the employer's proffered reason for the employment action was its actual motivation." *Id.* (citation omitted).  Again, the Court finds Defendant's reasons for terminating Plaintiff reasonable–Defendant has offered the reasoning that it expects its assistant managers not to partake in arguably suspicious

25

transactions and that it holds its assistant managers, as Defendant's representatives, to a different standard than its other employees.

Because Plaintiff has not established a prima facie case of age discrimination or created an issue of fact as to pretext, her age discrimination claims fail.

### C. Plaintiff's Family and Medical Leave Act claim

Plaintiff next claims that Defendant violated her Family and Medical Leave Act rights by either interfering with her rights or violating her rights by retaliating against her for her attempted use of those rights.

The FMLA entitles an eligible employee to take up to twelve weeks of leave per year if the employee has a serious health condition that prevents the employee from performing the functions on her job. *Branham v. Gannett Satellite Info. Network, Inc.*, 619 F.3d 563, 568 (6th Cir. 2010) (citations and quotation marks omitted). The FMLA provides private rights of action to employees to protect their FMLA rights. *Id.* The causes of action fall under the "interference"/ "entitlement" theory or the "retaliation theory"/"discrimination" theory.[10] *Id.*

### 1. Plaintiff cannot establish an FMLA interference claim

For interference, the FMLA makes "[i]t . . . unlawful for any employer to interfere with, restrain, or deny the exercise of or attempt to exercise, any right provided under this subchapter." 29 U.S.C. § 2615(a)(1); *see* 29 C.F.R. § 825.220(b), ("Any violations of the Act or of these regulations constitute interfering with, restraining, or denying the exercise

---

[10]Plaintiff argues that she has plead both an interference and retaliation claim. Defendant disputes this argument but addresses both claims. The Court does the same.

of rights provided by the Act."). If an employer violates the Act with respect to an employee it can be liable for damages and "for such equitable relief as may be appropriate." *Cavin v. Honda of Am. Mfg., Inc.*, 346 F.3d 713, 719 (6th Cir. 2003) (citing 29 U.S.C. § 2617(a)(1)).

To prevail on an interference claim, a plaintiff must establish that (1) she is an eligible employee; (2) the defendant is an employer; (3) the employee was entitled to leave under the FMLA; (4) the employee gave the employer notice of her intention to take leave; and (5) the employer denied the employee FMLA benefits to which she was entitled.[11] *Cavin*, 346 F.3d at 719 (citations and quotation marks omitted).

To take care of a spouse, the FMLA requires the employee to "provide the employer with not less than 30 days notice, before the date the leave is to begin, of the employee's intention to take leave under [the FMLA,] except that if the date of the treatment requires leave to being in less than 30 days, the employee shall provide such notice as is practicable." 29 U.S.C. § 2612(e)(2)(B). The FMLA does allow intermittent or reduced leave to an employee taking care of her spouse. 29 U.S.C. § 2612(b)(1).

District courts in this circuit have defined "interfering with" to include "violating the FMLA, refusing to authorize FMLA leave, discouraging an employee from taking FMLA leave, and manipulating the work force to avoid responsibilities under the FMLA." *Stanley v. Volvo Parts N. Am.*, No. 07-602, 2008 WL 2483658, at *3 (S.D. Ohio June 17, 2008) (citing *Hensley v. Baptist Hosp.*, 96-789, 1997 WL 880741, at *10 (E.D. Tenn. Oct. 27,

---

[11]"Employer" and "eligible employee" are terms that the FMLA defines; the parties do not dispute or address their statuses as employer and eligible employee.

1997)).  *See also Arban v. West Pub'l'g Corp.*, 345 F.3d 390, 402 (6th Cir. 2003) (citing 29 C.F.R. § 825.220(b), which also explains that "interfering with" the exercise of an employee's right under the FMLA includes "discouraging an employee from using [FMLA] leave.") (quotation marks omitted).

The issues here are the notice requirement and whether Monacelli discouraged Plaintiff when she allegedly told Plaintiff that she must take all 12 weeks of leave at once As to notice,  Plaintiff argues that she gave sufficient notice to Defendant that she wanted to take FMLA leave to care for her husband.[12]   She therefore argues that Defendant interfered with her FMLA rights when it told her that she had to take her entire twelve weeks of FMLA leave at once, and that information prevented her from exercising those rights.  Defendant argues that Plaintiff did not give sufficient notice of her intent to take FMLA leave and therefore it cannot be held liable for interfering with her FMLA rights.  The Court agrees with Defendant.  Plaintiff did not give the required notice to take FMLA leave. For Plaintiff to give the proper notice, she must give "enough information for the employer to reasonably conclude that the leave is needed for a serious health condition."  *Farhner v. United Transp. Union Discipline Income Protection Program*, No. 09-4431, –F.3d–, 2011 WL 1641551, at *4 (6th Cir. May 3, 2011).  *See Wright v. Marshal Mize Ford, Inc.*, No. 09-139, 2010 WL 3843780, at * (E.D. Tenn. Sept. 27, 2010) (finding that the plaintiff who stated he "most likely" would need FMLA leave did not give the required notice).  Here, Plaintiff only expressed an interest in learning about FMLA leave in the future.  That notice is not sufficient, as a matter of law, and Plaintiff's FMLA interference claim fails.

---

[12]Section 2612(a)(1)(C) entitles an eligible employee leave to take care of a spouse who has a serious health condition.  29 U.S.C. § 2612(a)(1)(C).

But even if Plaintiff gave the required notice, she has not shown that Defendant, and specifically Monacelli, discouraged Plaintiff from using her FMLA leave. Here, the Court finds that, although Monacelli allegedly misinterpreted Defendant's policy, Plaintiff had all the information she needed to take intermittent FMLA leave. Plaintiff received and read the FMLA forms. These forms are clear. The forms state that an employee can take intermittent leave. Granted, Plaintiff states that she had trouble comprehending when she reads, but she also states that she only read through the forms "real fast." (Pl.'s Dep. at 94.) The Court also notes that Plaintiff never asked anyone else about FMLA leave. She never contacted the human resources department. She never submitted any forms. This absence of further action is evidence that she failed to give sufficient notice as required by the FMLA.

### 2. Plaintiff has not established an FMLA retaliation claim

Under the retaliation theory, an employer may not "discharge or in any other manner discriminate against any individual for opposing any practice made unlawful" by the FMLA. *Branham*, 619 F.3d at 568 (citing 29 U.S.C. § 2615(a)(a) and *Hoge v. Honda of Am. Mfg., Inc.*, 384 F.3d 238, 244 (6th Cir. 2004)). With retaliation, the employer's motive is "an integral part of the analysis." *Edgar*, 443 F.3d at 508 (citation omitted). "The employer's motive is relevant because retaliation claims impose liability on employers that act against employees specifically *because* those employees invoked their FMLA rights." *Id.* (emphasis in original; citation omitted). Courts in the Sixth Circuit apply the *McDonnell Douglas* burden-shifting test to FMLA retaliation claims. *Id.* Plaintiff must therefore make out a prima facie case of discrimination by showing that (1) she availed herself of a

protected right under the FMLA by notifying Defendant of her intent to take leave, (2) she suffered an adverse employment action, and (3) that there was a causal connection between the exercise of her rights under the FMLA and the adverse employment action. *Id.* If Plaintiff makes this showing, then the burden shifts to Defendant to give a legitimate, nondiscriminatory rationale for discharging Plaintiff. *Id.*

Plaintiff here has not made out a prima facie case of FMLA retaliation. She has not put forth any evidence that her termination was causally related to her alleged exercise of FMLA rights. But even if she were able to establish a prima facie case she still cannot establish that Defendant's reason for terminating her was pretext for discrimination, as discussed above. Plaintiff thus cannot go forth with her FMLA retaliation claim.

### D. Plaintiff's associational Americans with Disabilities discrimination claim.

The ADA prohibits an employer from discriminating against "a qualified individual because of the known disability of an individual with whom the qualified individual is known to have a relationship or association." 42 U.S.C. § 12112(b)(4). The Sixth Circuit has recognized authority that allows claims under this section in three types of situations. *Overly v. Covenant Trans., Inc.*, 178 F. App'x 488, 493 (6th Cir. Apr. 27, 2008) (citing *Larimer v. IBM Corp.*, 370 F.3d 698, 700 (7th Cir. 2004). Here, the only type of situation that could apply to Plaintiff would be the so-called "distraction" situation, in which "the employee is somewhat inattentive at work because [her] spouse . . . has a disability that requires [her] attention, yet not so inattentive that to perform to [her] employer's satisfaction [s]he would need an accommodation, perhaps by being allowed to work shorter hours."

*Larimer*, 370 F.3d at 701.   The ADA does not require Defendant to reasonably accommodate an employee such as Plaintiff based on her association with a disabled person–here, allegedly her husband.   *Overly*, 178 F. App'x at 493.   The Sixth Circuit has stated that the ADA would only protect an employee if she were only distracted at work, but did not require a reasonable accommodation or if the employer's decision was based solely on an unsubstantiated belief that the employee would have to miss work because of the association.   *Id.* (citations and quotation marks omitted).

The Sixth Circuit has adopted a test by which a plaintiff can sustain a claim under § 12112(b)(4); a plaintiff must show: "(1) she was qualified for the position; (2) she was subject to an adverse employment action; (3) she was known to have a relative with disability; and (4) the adverse employment action occurred under a circumstance that raises a reasonable inference that the disability of the relative was a determining factor in the decision."   *Id.* (citations omitted).

Here, the Court agrees with Defendant–Plaintiff cannot succeed on this claim.   She has not shown that she was distracted at work.   Nor has she shown that Defendant's decision to terminate her was based solely on the unsubstantiated belief that she would miss any future work because of her husband.   *See Tyndall v. Nat'l Educ. Ctrs. Inc. of California*, 31 F.3d 209, 214 (4th Cir. 1994) (holding that the plaintiff's associational disability claim failed because her termination "was not based on any assumption regarding future absences related to [her son's] care, but instead resulted from her record of past absences and her clear indication that she needed additional time off.").   Here, there is no evidence that Defendant terminated Plaintiff based upon her husband's disability.   Granted,

31

Plaintiff alleges that Monacelli said something to the effect: "why don't you just quit and take care of your husband, you're old enough." (Pl.'s Dep. at 77.) But this statement, standing alone, cannot withstand summary judgment. In *Overly*, the Sixth Circuit found that the defendant employer that told the plaintiff alleging associational disability that she should "be taken off her job" was not enough to give rise to a claim under § 12112(b)(4). 178 F. App'x at 494. The Sixth Circuit noted that the employer's statements focused on the plaintiff's "request for a modified schedule, not on the fact that she ha[d] a disabled daughter." *Id.* The Court finds *Overly*'s facts analogous– Monacelli's statement to Plaintiff related to Plaintiff's request for an amended work schedule, not to Plaintiff's husband's disability. As the Sixth Circuit found that the plaintiff in *Overly*'s associational disability claim could not withstand summary judgment, the Court finds similarly here.

## IV.   Conclusion

For the above-stated reasons, the Court GRANTS Defendant's motion for summary judgment and the case is DISMISSED.

s/Nancy G. Edmunds
Nancy G. Edmunds
United States District Judge

Dated:  May 25, 2011

I hereby certify that a copy of the foregoing document was served upon counsel of record on May 25, 2011, by electronic and/or ordinary mail.

s/Carol A. Hemeyer
Case Manager

32